UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

| | |
|---|---|
| **MAS QUARAN INSTITUTE, INC.,** | **2:22-CV-10195-TGB-DRG** |
| Plaintiff/Counter-Defendant, | HON. TERRENCE G. BERG |
| vs. | |
| **SENTINEL INSURANCE CO., LTD,** | **ORDER GRANTING DEFENDANT'S MOTION FOR SUMMARY JUDGMENT (ECF NO. 22)** |
| Defendant/Counter-Plaintiff. | |

Plaintiff MAS Quaran Institute, Inc. ("Institute") brings suit against Defendant Sentinel Insurance Company, Limited ("Sentinel") for failing to provide insurance coverage for water damage suffered by the Institute's commercial property located on the border of Detroit and Dearborn, Michigan after an "extreme rainfall event" occurred in late June of 2021. Sentinel contends that the damage is not covered because it was caused by a flood, a type of damage excluded under the parties' policy.

Before the Court is Sentinel's Motion for Summary Judgment.[1] Fed. R. Civ. P. 56(a); ECF No. 22. The Motion is fully briefed. *See* ECF No. 29;

---

[1] *See Celotex Corp. v. Catrett*, 477 U.S. 317, 324 (1986). Rule 56(e) requires the nonmoving party to go beyond the pleadings and, by their own affidavits or by the depositions, answers to interrogatories, and admissions on file, designate specific facts showing that there is a genuine issue for trial.

ECF No. 32. Because the Institute fails to present a genuine issue of material fact, nor objective evidence establishing coverage entitlement, Sentinel's Motion will be **GRANTED**.

## I.   BACKGROUND

MAS Quaran Institute is a Michigan domestic nonprofit corporation based in Wayne County. ECF No. 7, PageID.159. The Institute owns commercial property located at 4430 Saint James Street in Detroit. ECF No. 1, PageID.1; *see* ECF No. 1-2, PageID.11; ECF No. 7, PageID.158–59. Sentinel Insurance Company is a foreign insurer incorporated in the State of Connecticut, and doing business in Wayne County, Michigan, with its principal place of business in Hartford, Connecticut. ECF No. 7, PageID.160. The Court possesses original jurisdiction over this action, as there is complete diversity and the amount-in-controversy exceeds $75,000. 28 U.S.C. § 1332; *See* ECF No. 7, PageID.160. Accordingly, Michigan's substantive law governs. *Lindenberg v. Jackson Nat'l Life Ins. Co.*, 912 F.3d 348, 360 (6th Cir. 2018).

### A. The Heavy Rainfall Event

Over Friday, June 25 and Saturday, June 26, 2021, a torrential downpour battered Southeast Michigan. The region experienced power outages, sewer backups, and widespread flooding: stranding hundreds of vehicles on area freeways, submerging countless below-grade structures, and prompting thousands of calls to emergency

2

dispatchers.[2] ECF No. 22-6, PageID.489. By early Saturday afternoon, Governor Gretchen Whitmer had declared a state of emergency for Wayne County, mobilizing state resources to assist with the crisis. ECF No. 22-9, PageID.508–10. First responders, after assisting those in need, prioritized assessing the extent of damage and preventing any more ripple effects. News media, meanwhile, kept the public informed with regular updates, while also investigating the impact of the storms on the people and property in the region. ECF No. 22-6, PageID.489; ECF No. 22-10, PageID.512. The result of the heavy rainfall event was to overwhelm urban water management systems, its effects intensified by the region's natural topography, hydropedological characteristics, and hard infrastructure.

---

[2] NAT'L WEATHER SERV., *Metro Detroit Flooding*, Nat'l Oceanic Atmospheric Admin.

On Friday, June 25, 2021, at around 9:00 am, thunderstorms approaching from the southwest had drawn into southeastern Michigan. This first round of heavy rainfall was supported by a surface low-pressure system tracking along a stationary boundary draped across the Great Lakes region. By 8:00 pm, widespread rainfall accumulations of 1–3 inches. were observed with rainfall rates reaching 1.5–2 inches. per hour.

The heaviest rainfall occurred along the frontal boundary, running parallel to the I-94 corridor in Washtenaw and Wayne Counties. Thunderstorm activity repeatedly trained over these areas for several hours overnight, with rainfall rates around 1-2 inches per hour. By Saturday afternoon , most of the metro Detroit region was reporting 24-hour rainfall amounts of 3-6 inches, although some locally higher amounts (e.g., up to 8 inches in Grosse Pointe) were reported.

Out of Wayne County's many municipalities, the City of Dearborn bore a significant brunt of the weekend's deluge. The city's vulnerability—especially on its eastside, bordering Plaintiff's commercial property—is attributable, in good part, to the Rouge River Watershed. Within the watershed's 467 square mile drainage area sits nearly 50 municipalities, Detroit and Dearborn among them. Because of rapid urbanization over the 20th century, a plethora of the watershed's surface "ghost" streams, which would have drained into the Rouge River, no longer exist—leaving few defined drainage routes. ECF No. 22-11, PageID.516; *see* Appendix. Subsequently, during heavy rainfall, water is directed into local and municipal water systems, escalating the volume of runoff. East Dearborn, geographically situated within the watershed's lower reaches, serves as a natural recipient of these upstream runoffs. Making matters worse, East Dearborn's sewerage and drainage system remains a relic of the early-to-mid-20th century—stormwater flows largely through two outlets: one constructed in the 1920s and consisting of two large diameter pipes, the other added in the 1960s for greater (albeit, as shown here, still insufficient) relief. ECF No. 22-11, PageID.516. When overwhelmed, the outlets risk submergence, only compounding the area's runoff and drainage problems.

Besieged by 7.5 inches of rain in a 24-hour period, the June deluge exposed East Dearborn's fragility and unenviable susceptibility to this freshet. *See* ECF No. 22-11, PageID.517. The rainfall event vastly

exceeded the area's average monthly rainfall during even its wettest months, August through September. For perspective, the average annual rainfall in the State of Michigan is 30–48 inches. In the Detroit area, the average monthly rainfall during its wettest months of April through September is 3.05–3.27 inches: meaning that Dearborn received more rain that weekend in that 24-hour period than the Detroit area normally receives over an entire month. ECF No. 22-11, PageID.517.

Once the weather calmed that weekend, the Institute—and probably many similarly affected insurance policyholders—wasted little time in surveying their damages and turning to their insurers for assistance. *See, e.g.,* ECF No. 22-2. The denial of the Institute's claim resulted in this lawsuit.

## B. The Insurance Policy

Sentinel issued a policy of insurance to the Institute for "the effective period of February 22, 2021 to February 22, 2022[.]" ECF No. 7, PageID.161; ECF No. 1-2. This Spectrum Business Owner's Policy ("Policy" or "Agreement") contains, "among other types of coverage, first-party commercial property ("CP") coverage for the Property." ECF No. 22, PageID.420; ECF No. 29, PageID.760. Within the Policy's commercial property section is the "insuring agreement" undergirding this lawsuit: The Special Property Coverage Form, No. SS 00 07 07 05 ("SP Form"). ECF No. 1-2, PageID.36–60; *see* ECF No. 7, PageID.178–79. The SP Form obligates Sentinel to cover "direct physical loss of or physical damage to

'Covered Property,' ECF No. 1-2, PageID.20–27, at the premises described in the Declarations caused by or resulting from a 'Covered Cause of Loss.'" ECF No. 1-2, PageID.36.

The terms 'Covered Property' and 'Covered Causes of Loss' are defined by the Policy:

A. COVERAGE

We will pay for direct physical loss of or physical damage to Covered Property at the premises described in the Declarations (also called "scheduled premises" in this policy) caused by or resulting from a Covered Cause of Loss.

1. Covered Property

Covered Property as used in this policy, means the following types of property for which a Limit of Insurance is shown in the Declarations:

a. Buildings, meaning only building(s) and structure(s) described in the Declarations[.]

b. Business Personal Property located in or on the building(s) described in the Declarations at the "scheduled premises" or in the open (or in a vehicle) within 1,000 feet of the "scheduled premises[.]"

[…]
3. Covered Causes of Loss

RISKS OF DIRECT PHYSICAL LOSS unless the loss is:

a. Excluded in Section B., EXCLUSIONS; or

b. Limited in Paragraph A.4. Limitations[.]

ECF No. 1-2, PageID.28–29.

As SP Form § A(3) conveys, insurance coverage for losses at, and damages to, the scheduled premises is not without limit. Rather, SP Form § B lists particular and specific causes of loss excepted from the Policy's commercial property coverage. ECF No. 1-2, PageID.51–60. Among them, and critical to the present controversy, is the 'Water Exclusion':

> B. EXCLUSIONS
> 1. We will not pay for loss or damage caused directly or indirectly by any of the following. Such loss or damage is excluded regardless of any other cause or event that contributes concurrently or in any sequence to the loss.
> […]
>
> > f. Water
> >
> > > (1) Flood, including the accumulation of surface water, waves, tides, tidal waves, overflow of streams or another bodies of water, or their spray, all whether driven by wind or not; […]
> > >
> > > (3) Water that backs up from a sewer or drain; or
> > >
> > > (4) Water under the ground surface pressing on, or flowing or seeping through:
> > >
> > > > (a) Foundations, walls, floors or paved surfaces;
> > > >
> > > > (b) Basements, whether paved or not; or
> > > >
> > > > (c) Doors, windows or other openings.
> > > >
> > > > But if loss or damage by fire, explosion or sprinkler leakage results, we will pay for that results, we will we will pay for that resulting physical loss or physical damage[.]

ECF No. 1-2, PageID.51–52; ECF No. 7, PageID.179–80.

Whereas the Policy excludes losses caused by "[w]ater backing up from a sewer or drain," ECF No. 22-13, PageID.605, it also included a "Stretch for Schools" Endorsement that further modified the parties' commercial property coverage terms, supplementing and amending the standard policy (and its exclusions):[3]

D. [...]

16. Sewer and Drain Backup

The following Additional Coverage is added:

We will pay for direct physical loss or physical damage to Covered Property at the "scheduled premises" solely caused by water that backs up from a sewer or drain[.]

**THIS IS NOT FLOOD INSURANCE.**

We will not pay for water or other materials that back up from any sewer or drain when it is caused by any flood. This applies regardless of the proximity of the flood to Covered Property. Flood includes the accumulation of surface water, waves, tides, tidal waves, overflow of streams or other bodies of water, or their spray, all whether driven by wind or not that enters the sewer or drain system.

---

[3] At the top of the first page of the Endorsement (Form SS 40 42 09 07), directly above the "Stretch for Schools" header is a bolded, enlarged statement: "This Endorsement Changes the Policy. Please Read it Carefully." In the space directly below, the drafter reiterates the point, and expands: "This endorsement modifies insurance provided under the following: Standard Property Coverage Form[,] Special Property Coverage Form." ECF No. 1-2, PageID.114; *see* ECF No. 29, PageID.777–78.

17. Sump Overflow or Sump Pump Failure

The following Additional Coverage is added:
[W]e will pay…for any loss…resulting from physical loss or physical damage to Covered Property that is caused by or resulting from water that overflows due to the failure of a sump pump, sump pump well, or any other type of system designed to remove subsurface water from the foundation area if the failure is directly or indirectly the result of a Covered Cause of Loss. Failure means an abrupt cessation of normal functioning[.]

**THIS IS NOT FLOOD INSURANCE.**

We will not pay for water or other materials that back up from any sewer or drain when it is caused by any flood. This applies regardless of the proximity of the flood to Covered Property. Flood includes the accumulation of surface water, waves, tides, tidal waves, overflow of streams or other bodies of water, or their spray, all whether driven by wind or not that enters the sewer or drain system.

ECF No. 1-2, PageID.118; ECF No. 7, PageID.183–84.

## II.   PROCEDURAL HISTORY

On July 12, 2021, Sentinel issued a claim rejection letter to the Institute denying coverage for the June 25–26 commercial property damage. The reason provided: Policy exclusions and limitations for flood and surface water. ECF No. 10-3, PageID.370. Yet the Institute repeatedly asserted, and continues to assert, that the damages resulted from water backing up through drains and toilets—therefore, it did not qualify as flood or surface water. ECF No. 7, PageID.178; ECF No. 10, PageID.346. Accordingly, the Institute contends, the claim must be covered under the Policy. ECF No. 1, PageID.3. On July 28, 2023, the insurer filed this motion. ECF No. 22.

9

### III.   LEGAL STANDARD

"Summary judgment is appropriate if the pleadings, depositions, answers to interrogatories, and admissions on file, together with any affidavits, show that there is no genuine issue as to any material fact such that the movant is entitled to a judgment as a matter of law." *Villegas v. Metro. Gov't of Nashville*, 709 F.3d 563, 568 (6th Cir. 2013); *see also* Fed. R. Civ. P. 56(a).

"A fact is 'material' for purposes of a motion for summary judgment where proof of that fact 'would have [the] effect of establishing or refuting one of the essential elements of a cause of action or defense asserted by the parties.'" *Dekarske v. Fed. Exp. Corp.*, 294 F.R.D. 68, 77 (E.D. Mich. 2013); *Dekarske*, 294 F.R.D. at 77 (quoting *Kendall v. Hoover Co.*, 751 F.2d 171, 174 (6th Cir. 1984)). Relatedly, a dispute is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247–48 (1986).

In general, on a motion for summary judgment, the Court must view the evidence and any reasonable inferences drawn from the evidence in the light most favorable to the non-moving party. *See Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986) (citations omitted); *Redding v. St. Eward*, 241 F.3d 530, 531 (6th Cir. 2001). Even so, the party opposing summary judgment "must come forward with specific facts showing that there is a genuine

10

issue for trial." *Matsushita Elec. Indus. Co.*, 475 U.S. at 587. Put another way, the non-movant must produce enough evidence to allow a reasonable jury to find in their favor by a preponderance of the evidence.[4] *See Anderson*, 477 U.S. at 252.

'Mere possibility' of a factual dispute cannot create a triable case. *Combs v. Int'l Ins. Co.*, 354 F.3d 568, 576 (6th Cir. 2004). The non-movant must demonstrate "sufficient probative evidence" that would permit a finding in its favor "on more than mere speculation, conjecture, or fantasy." *Arendale v. City of Memphis*, 519 F.3d 587, 601 (6th Cir. 2008). The trial court need not "search the entire record to establish that it is bereft of a genuine issue of material fact." *St. v. Street*, 886 F.2d at 1479–80. Instead, the "nonmoving party has an affirmative duty to direct the court's attention to those specific portions of the record upon which it seeks to rely to create a genuine issue of material fact." *In re Morris*, 260 F.3d 654, 655 (6th Cir. 2001).

The Court must then determine whether the evidence presents a sufficient factual disagreement to require submission of the challenged claims to the trier of fact or whether the moving party must prevail as a matter of law. *See Anderson*, 477 U.S. at 252. In this sense, the "central issue is whether the evidence presents a sufficient disagreement to

---

[4] The Court may only consider evidence that could be presented in a form that would be admissible at trial. *See Alexander v. CareSource*, 576 F.3d 551, 558–59 (6th Cir. 2009).

require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." *Binay v. Bettendorf*, 601 F.3d 640, 646 (6th Cir. 2010).

## IV. DISCUSSION

### A. Principles of Insurance Policy Interpretation

The construction of an insurance contract is a matter of law for the Court. *Est. of Dojcinovic by Dojcinovic v. ACE Prop. & Cas. Ins. Co.*, --- F. Supp. 3d ---, No. 21-11928, 2023 WL 6163482, at *3 (E.D. Mich. Sept. 21, 2023) (Michelson, J.); *see Sunshine Motors, Inc. v. New Hampshire Ins. Co.*, 530 N.W.2d 120, 121 (Mich. Ct. App. 1995) (citing *Mueller v. Frankenmuth Mut. Ins. Co.*, 459 N.W.2d 95 (Mich. Ct. App. 1990)). "[I]n reviewing an insurance policy dispute we must look to the language of the insurance policy and interpret the terms therein in accordance with Michigan's well-established [general] principles of contract construction." *Citizens Ins. Co. v. Pro-Seal Serv. Grp., Inc.*, 730 N.W.2d 682, 685 (Mich. 2007). A "court must look at the [policy] as a whole and give meaning to all terms.*" Auto Owners Ins. Co. v. Seils*, 871 N.W.2d 530, 539 (Mich. Ct. App. 2015) (quoting *Auto-Owners Ins. Co. v. Churchman*, 489 N.W.2d 431, 434 (Mich. 1992)); *Fresard v. Michigan Millers Mut. Ins. Co.*, 327 N.W.2d 286, 289 (Mich. 1982).

If a fair reading of an insurance policy leads one to understand that there could be coverage under particular circumstances but also no coverage under the same circumstances, then the contract is ambiguous.

*Raska v. Farm Bureau Mut. Ins. Co. of Michigan*, 314 N.W.2d 440, 441 (Mich. 1982). Ambiguous provisions in an insurance policy are construed against the insurer and in favor of coverage. *Heniser v. Frankenmuth Mut. Ins. Co.*, 534 N.W.2d 502, 505 (Mich. 1995); *Grp. Ins. Co. of Michigan v. Czopek*, 489 N.W.2d 444 (Mich. 1992). But where the policy, "however inartfully worded or clumsily arranged, fairly admits of but one interpretation it may not be said to be ambiguous or, indeed, fatally unclear." *Id*. Moreover, "that a policy does not define a relevant term does not render the policy ambiguous. Rather, [the Court] must interpret the terms of the contract in accordance with their commonly used meanings."[5] *Cap. Cap. Mortg. Sols., LLC v. Cincinnati Ins. Co.*, 674 F. Supp. 3d 392 (E.D. Mich. 2023), *appeal dismissed sub nom. Cap. Mortg. Sols., LLC v. Cincinnati Ins. Co., Inc.*, No. 23-1596, 2023 WL 9055472 (6th Cir. July 17, 2023) (Borman, J.) (quoting *Henderson v. State Farm Fire & Cas. Co.*, 596 N.W.2d 190 (Mich. 1999)).

When the policy is clear, courts are bound by the specific language set forth within it. *Raska*, 314 N.W.2d at 441; *see also Citizens Ins. Co.*, 730 N.W.2d at 686 ("A court must not hold an insurer liable for a risk that it did not assume."). Similarly, any clause in an insurance policy is valid as long as it is clear, unambiguous, and not in contravention of

---

[5] "Indeed, we do not ascribe ambiguity to words simply because dictionary publishers are obliged to define words differently to avoid possible plagiarism." *Citizens Ins. Co.*, 730 N.W.2d at 686 (quoting *Henderson v. State Farm Fire & Cas. Co.*, 596 N.W.2d 190 (Mich. 1999)).

public policy. *Id.*; *see Upjohn Co. v. New Hampshire Ins. Co.*, 476 N.W.2d 392, 397 (Mich. 1991) (stating the terms of an insurance policy must be given their plain meaning and that courts must not "create an ambiguity where none exists"); *see also Heniser*, 534 N.W.2d at 505 ("An insurer is free to define or limit the scope of coverage as long as the policy language fairly leads to only one reasonable interpretation and is not in contravention of public policy. If these prerequisites are fulfilled, the policy will be enforced as written.") (internal citations omitted).

Against this interpretive backdrop, Michigan courts are to undertake, where necessary, a two-step coverage analysis: (i) Does the general insurance policy cover the occurrence? (ii) If so, does an exclusion negate the coverage? *Hunt v. Drielick*, 852 N.W.2d 562, 565 (Mich. 2014). It is the insured's burden to establish that their claim falls within the terms of the policy; in turn, the insurer has the burden to prove that one of the policy's exclusions applies. *Seils*, 871 N.W.2d at 539..

Exclusionary clauses in insurance policies are "strictly construed in favor of the insured." *Churchman*, 489 N.W.2d at 434. But if any exclusion within the policy applies to an insured's particular claims, coverage under the policy is lost. *Id.*; *see also Seils*, 871 N.W.2d at 539 ("Clear and specific exclusions will be enforced as written").

## B. The Parties' Arguments

Sentinel contends that the Institute has not established that the damage stems entirely from a Covered Cause of Loss. Thus, it concludes, the Institute is prevented from obtaining recovery under the Policy:

> The only available coverage under the Endorsement is for damage caused ***solely*** by sewer or drain backup, wholly unrelated to flood. That is not the case here. There is no reasonable dispute that the water damage would not have occurred but for the historic Rain Event. The damage was not ***solely*** caused by sewer or drain backup.

ECF No. 32, PageID.987 (emphasis in original); *see also* ECF No. 22, PageID.420–21.

Sentinel also a declaratory judgment from the Court validating its withholding of coverage to the Institute here. ECF No. 7, PageID.176, 193.

In turn, the Institute relies on the Policy's "Stretch for Schools" Endorsement. The Institute opposes summary judgment motion on three interconnected grounds:

(1) The Institute acknowledges that the Policy, at first, excluded any coverage for any loss or damage caused indirectly or indirectly by "[w]ater that backs up from a sewer or drain[.]" ECF No. 29, PageID.777–78; ECF No. 22-13, PageID.605. The Institute maintains, however, that "the [Stretch for Schools] Endorsement changed and modified the Policy, adding back [in] coverage for sewer or drain backup, sump overflow, or

15

sump pump failure." ECF No. 29, PageID.777–78; ECF No. 22-13, PageID.672. Furthermore, "unlike other endorsements in the Policy, the respective [Stretch for Schools] Endorsement doesn't incorporate any language from the Policy's exclusions, and doesn't include in [the Stretch] the [exclusions'] 'caused by directly or indirectly' language[.]" ECF No. 29, PageID.777–78; ECF No. 22-13, PageID.672. It appears that, in the Institute's view, this omission means there is no longer any anti-concurrent causation limitation respecting claims for sewerage or drainage backup and sump overflow or sump pump failure. ECF No. 29, PageID.777–78.

(2) Were the Court to hold that the Policy and Endorsement exclude coverage for "water caused by flood," the Institute asserts summary judgment would not be appropriate, proclaiming that Sentinel "hasn't established that Plaintiff's Property was *specifically* damaged by the flood." ECF No. 29, PageID.779 (emphasis added). The Institute also emphasizes that the parties and their experts "dispute the specific cause of the damage." ECF No. 29, PageID.779. It continues, "Sentinel alleges that some areas of the State of Michigan may have been flooded, but Sentinel can't by implication also conclude that Plaintiff's Property must have also been damaged by flood without providing any undisputed evidence regarding the [C]ause of [L]oss." *Id.* Plaintiff also asserts that "it is well-established that flood water is surface water, and that once surface water enters plumbing systems, it ceases to be surface water."

16

ECF No. 29, PageID.783. In contrast to the insurer, the Institute states that "Plaintiff has submitted evidence showing that its Property was damaged by water that backs up from a sewer, drain, or sump pump." *Id.* As such, "Plaintiff has established a prima facie case for coverage under the Endorsement," therefore Sentinel's Motion for Summary Judgment must be denied. *Id.*

(3) If the above is unavailing, the Institute retains a fallback: "At the very least, viewing the evidence in the light most favorable to Plaintiff," the Institute insists, "there is a genuine dispute of material fact regarding the cause of damage to Plaintiff's Property." *Id.*

### C. The 'Stretch' Endorsement

The Institute notes that, under Michigan law, "endorsements by their very nature are designed to trump general policy provisions," and that "where a conflict exists between provisions in the main policy and the endorsement, the endorsement prevails." ECF No. 29, PageID 778; *Besic v. Citizens Ins. Co. of the Midwest*, 800 N.W.2d 93, 97 (Mich. Ct. App. 2010). But this rule in *Besic* means that an endorsement prevails *when there is a direct conflict* with the provisions of the main policy, it does not mean that an endorsement automatically trumps *all* relevant, tangential, or vaguely related policy provisions. *Id.* (citing 4 HOLMES, *Appleman on Insurance* § 20.1 (2d ed. 1996) for the notion that endorsements often "are issued to *specifically* grant *certain* coverage or remove the effect of *particular* exclusions") (emphasis added).

17

Where a conflict is alleged to exist between the main policy's provision(s) and an endorsement's provision(s), the Court is to "first consider the effect of the riders, in and of themselves." *Peterson v. Zurich Ins. Co.*, 225 N.W.2d 776, 779 (Mich. Ct. App. 1975) (quoting *Jackson v. Brit. Am. Assur. Co.*, 63 N.W. 899, 900 (Mich. 1895)). If the endorsement and main policy are "inconsistent and irreconcilable, the riders must control." *Id.* Put simply, if there is a conflict, the endorsement prevails, modifying the conflicting portions of the main policy. Likewise, where the endorsement supplies additional provisions that do not conflict with the main policy, the endorsement provisions will be incorporated. Yet where the main policy includes provisions that are relevant to the endorsement, but the endorsement is silent as those subjects and does not directly conflict with them, those provisions of the main policy which do not directly conflict with the endorsement remain effective. *Id.* ("[A]ll parts of [a] policy are to be harmonized and given effect, if it can be consistently done, and…unless the riders are irreconcilable with the printed clause quoted, such clause must stand."). *See Jackson*, 63 N.W. at 901 ("There is no necessary conflict between such provisions, and, had this clause…been printed upon the rider, no dispute could arise over it.").

In interpreting the Endorsement and the Policy, the Institute cherry-picks certain clauses it believes support its position. It properly notes that the Water Exclusion, under the Policy, excludes "any coverage for any loss or damage caused directly or indirectly by water that backs

18

up from a sewer or drain." ECF No. 29, PageID.777. The Institute is also correct, in part, that the Endorsement "add[s] coverage for sewer or drain backup, sump overflow, or sump pump failure." ECF No. 29, PageID.778.

But Plaintiff continues: "Unlike other endorsements in the Policy, the respective Endorsement doesn't incorporate any language from the Policy's exclusions, and doesn't include in it the 'caused by directly or indirectly' language (anti-concurrent causation). Sentinel argues that the plain terms of the Policy's Water Exclusion preclude coverage. Sentinel is wrong." *Id.*

In support of its position, the Institute cites *Besic, Appleman on Insurance,* both discussed above, and the case of *Hawkeye-Security Ins. Co. v. Vector Const. Co.*, for the proposition that "[w]hen a conflict arises between the terms of an endorsement and the form provisions of an insurance contract, the terms of the endorsement prevail." 460 N.W.2d 329, 334 (Mich. Ct. App. 1990).

Finally, the Institute adds: "Even though the Policy contains a Water Exclusion," the Endorsement acts to "modif[y] the Policy by providing coverage for water that backs up from a sewer or drain, and sump overflow or sump pump failure." ECF No. 29, PageID.777–78.

The Institute appears to take the position that because the Endorsement does not repeat the anti-concurrent causation language present in the Policy and the relevant Exclusion, by such silence it somehow acts to tacitly supersede the Water Exclusion. This is incorrect.

19

Again, the Endorsement provides:

The following changes apply…to the Special Property Coverage Form[:]

[16.] The following *Additional* Coverage is *added*: We will pay for *direct* physical loss or physical damage to Covered Property at the "scheduled premises" *solely* caused by water that backs up from a sewer or drain[.]

[17.] The following *Additional* Coverage is *added*: [W]e will pay…for any loss…resulting from physical loss or physical damage to Covered Property that is caused by or resulting from water that overflows due to the failure of a sump pump, sump pump well, or any other type of system designed to remove subsurface water from the foundation area *if the* failure is *directly or indirectly* the result of a Covered Cause of Loss. Failure means an abrupt cessation of normal functioning[.]

ECF No. 1-2, PageID.118 (emphasis added); ECF No. 7, PageID.183–84.

The Exclusion states:

We will not pay for loss or damage caused directly or indirectly by any of the following. Such loss or damage is excluded regardless of any other cause or event that contributes concurrently or in any sequence to the loss[.]

(1) Flood, including the accumulation of surface water, waves, tides, tidal waves, overflow of streams or another bodies of water, or their spray, all whether driven by wind or not[;]

(3) Water that backs up from a sewer or drain; or

(4) Water under the ground surface pressing on, or flowing or seeping through: (a) Foundations, walls, floors or paved surfaces; (b) Basements, whether paved or not; or (c) Doors, windows or other openings[.]

ECF No. 1-2, PageID.51–52; ECF No. 7, PageID.179-80.

The Court concludes no ambiguity exists, nor is there any conflict, between the Endorsement and the Policy. The Endorsement in no way

vitiates the Exclusion's anti-concurrent causation clause. The Stretch is explicit, repeatedly so, that it *adds* to the Policy. Yes, the Endorsement modifies the Policy to allow coverage "for water that 'backs up from a sewer or drain' and for sump overflow or sump pump failure." ECF No. 29, PageID.760. But that coverage is, in part, contingent on the absence of any concurrent or sequential Policy Exclusion.

Even when considered alone, the Endorsement itself contains exclusions to coverage that Plaintiff seems disinclined to contend with substantively or on the merits. For damage from "water that backs up from a sewer or drain" to be covered, it must be the *sole* **cause** of the damage; and, for damage "caused by or resulting from water that overflows due to the failure of a sump pump, sump pump well, or any other type of system designed to remove subsurface water from the foundation area" to be covered, the failure must be *"directly or indirectly the result of a Covered Cause of Loss."* ECF No. 1-2, PageID.118. Immediately below the clauses in Stretch § D(16) and Stretch § D(17) that 'give back' coverage for sewerage and drainage backups and for sump pump failures respectively, the Policy restates, in bold face capital letters:

**THIS IS NOT FLOOD INSURANCE.**

We will not pay for water or other materials that back up from any sewer or drain when it is caused by any flood.

This applies regardless of the proximity of the flood to Covered Property.

Flood includes the accumulation of surface water, waves, tides, tidal waves, overflow of streams or other bodies of water, or their spray, all whether driven by wind or not that enters the sewer or drain system.

ECF No. 1-2, PageID.118; ECF No. 7, PageID.183–84.

### D. The Burden of Proof Framework

The Institute further asserts, repeatedly, that Sentinel bears responsibility for—and has not satisfied—the burden of proof to show that the claim is excluded from Policy coverage. ECF No. 29, PageID.776, 64, 79, 82–86, 90. This is not correct.

In *Delta Technical Prods. Lab. Inv. Recovery, Inc. v. Hartford Cas. Ins.,* an Illinois appellate court heard argument on appeal brought by plaintiff-insuree against its commercial property insurer, following a grant of summary judgment for the defendant. No. 1-12-2158 (Ill. Ct. App. Jan. 31, 2014). The policy and the arguments raised by the *Delta* parties were, where relevant, nearly carbon-copies of those presented here— Plaintiff-insuree alleged that defendant-insurer wrongfully refused coverage when it determined the Plaintiff's commercial property damages were due to a two-day substantial rain event, and therefore not covered by the policy, because it excluded flood damage. *Delta Tech. Prod. Lab'y Inv. Recovery, Inc. v. Hartford Cas. Ins. Co.,* No. 1-12-2158, 2014

WL 376865 (Ill. App. Ct. Jan. 31, 2014).     Among other objections, Delta protested that the trial court had "erroneously saddled [plaintiff-insuree] with the burden of proving that a blockage existed and disproving that flooding was a concurrent cause." Delta argued that it "was not obligated to prove that a blockage existed and that it was [defendant-insurer's] burden to prove that flooding was the cause." *Id.* at *9. The appellate court made short work of this burden displacement theory, noting that it is long-established that the initial burden rests on the insured to prove that its claim falls within the coverage of the policy. *Id.* Only after the insured establishes coverage does the burden shift to the insurer to prove that a limitation or exclusion applies. *Id.* "As [plaintiff-insuree] claimed coverage under the sewer-and-drain back-up endorsement, it was rightfully its burden to establish coverage thereunder." *Id.* (citing, e.g., *Reedy Indus., Inc. v. Hartford Ins. Co. of Illinois*, 715 N.E.2d 728 (Ill. App. Ct. 1999), which held that a plaintiff-insuree must "come forward with some evidence that its claim falls within the terms of the policy," to withstand a defendant-insurer's motion for summary judgment).

The burden of proof framework explained by the *Delta* panel has, likewise, been followed in this district as well. In *Est. of Dojcinovic by Dojcinovic v. Citizens Ins. Co. of the Midwest*, a decedent's policy provided the insured with Personal Injury Protections ("PIP") through a "Michigan Personal Injury Protection" Endorsement. Included in the PIP

Endorsement was a list of exclusions, "which unequivocally state[d], 'we will not pay Personal Injury Protection benefits for bodily injury...to anyone arising out of the ownership, operation, maintenance, or use of a covered auto while being used in the business of any lessee or while being used to transport cargo of any type.'" 583 F. Supp. 3d 972, 979–80 (E.D. Mich. 2022) (Cleland, J.). When decedent's estate attempted to draw a corollary with *Besic*, the district court disagreed. "Unlike *Besic*, the policy issued…contains an explicit exclusion in the PIP endorsement." *Id.* The onus rested with the decedent's estate to first demonstrate that the PIP endorsement's exclusion did not apply. The estate could not. As a result, the district court concluded that the "plain language of th[e] exclusion must control. Consequently, no PIP coverage is available to the [p]laintiffs under the…policy." *Id.*

The Court concurs with the reasoning and holdings in *Delta* and *Est. of Dojcinovic*. As insured, the Institute has the initial obligation to show that it is entitled to coverage under the Policy as modified by the Endorsement. *See Heniser*, 534 N.W.2d at 510 ("It is the insured's burden to establish that [its] claim falls within the terms of the policy.") (citing *Harvey Oil Co. v. Federated Mut. Ins. Co.*, 837 F. Supp. 242, 244 (W.D. Mich. 1993), *aff'd,* 61 F.3d 903 (6th Cir. 1995)).

### E. Flood Water v. "Surface Water"

None of the Institute's allegations about Sentinel's supposed burdens may be considered until the Institute establishes its prima facie

case for coverage. The Institute believes it has done so, "because it has demonstrated that the water damage to its Property was *solely* caused by water that backed up from a sewer or drain, or caused by or resulting from water that overflowed due to the failure of a sump pump, sump pump well, or any other type of system designed to remove subsurface water from the foundation area." ECF No. 29, PageID.777 (emphasis added). But there is a difference between adamantly asserting that a proposition has been demonstrated and actually presenting evidence to prove it. Plaintiff does the one, but not the other.

The Institute contends that as long as it has "provided evidence establishing that the Property's water damage was caused [by] water backing up from the sewer, drains, and sump pump[,]"it need not engage with the argument that the water backup was caused, at least in part, by a flood. This non-engagement is appropriate, the Institute reasons, because even "[i]f this Court somehow finds that flood waters were responsible for 'inundating' the sewers and drains, as Sentinel alleges, it is well established that *flood* water is *surface* water, and that once *surface* water enters plumbing systems, it ceases to be *surface* water." ECF No. 29, PageID.783; *see also id.* at 785–86 (emphasis added) (insisting again that Defendant's summary judgment "must be denied because…it is well established that any allegedly flood water that did enter and overwhelm the sewer system lost its character as surface water the moment it entered the sewer system [and] after the water lost its character as

25

surface water, the terms of the Policy's Water Exclusion no longer applied.").[6]

Unfortunately for Plaintiff, the character of the water is irrelevant here. In *Rose Ann Int'l, Inc. v. Hartford Ins. Co.*, the district court considered the Stretch Endorsement at issue in this case and explained why. No. 03-CV-698, 2005 WL 8175960 (D.N.J. Aug. 4, 2005). There, the plaintiff's property suffered from water damage caused by heavy rains; specifically, the "water from these storms ran off…onto the street…that water ran off the street into the sewer drains, and that water backed up from the drains into the [plaintiff's property]." *Id.* at *2. The controlling policy, in all relevant respects, was identical to the Institute's policy—Stretch Endorsement included. *Id.* at *1. The plaintiff contended that the Stretch Endorsement covered sewage or drain backup "even when it occurs sequentially with uninsured risks." *Id.* at *3. The court held otherwise. It noted that the relevant language in the Special Property Coverage Form was unambiguous—it excluded damage "caused 'directly or *indirectly*' by flood, surface water, or the like, *regardless* of any other

---

[6] Plaintiff reiterates this contention at several points: "Plaintiff is not conceding that flood water was responsible for inundating the sewer system, but if it is determined that flood water *was* responsible for overwhelming the sewer system, any damage resulting from water that backs up from the drains can no longer be considered damage from surface water within the meaning of the Policy's Water Exclusion." ECF No. 29, PageID.785 fn.2 (emphasis in original). "Again, Plaintiff is not conceding that *flood* water was responsible for entering and inundating the sewer system." ECF No. 29, PageID.787 (emphasis in original).

cause or event that contributes concurrently or in any sequence to the loss." *Id.* at 3. (emphasis in original).

The district court continued, observing that the Stretch Endorsement exclusively covered water damage "*solely* caused by water that backs up from a sewage or drain," and that, as the case here, the Stretch made it quite clear: THIS IS NOT FLOOD INSURANCE. *Id.* The *Rose Ann Int'l* court pointed out that the language of the policy "directly contradict[ed]" the plaintiff's contention that the Stretch Endorsement covers sewer or drain backup "regardless of where in the chain of events that peril occurs." *Id.* "Clearly, if the backup was caused even partially by a flood, the language of the Stretch Endorsement, read in conjunction with the…Form, precludes recovery." *Id.; see also Cap. Mortg. Solutions*, 2023 WL 3632705, at *7, n.4 (recognizing that its analysis focused on water that entered from one source, and not on water that entered from another source, the court stated it "need not elaborate on this point…because the Policy provides that the water exclusion applies 'regardless of any other cause or event contributing concurrently or in any sequence to the 'physical loss'") (Borman, J.).

Sentinel also relies on *Sunshine Motors, Inc. v. New Hampshire Ins. Co.* as precedent that fatally undermines the Institute's coverage claim. *Sunshine Motors, Inc.*, 209 Mich. App. 58. In *Sunshine Motors*, a heavy rainfall event flooded the plaintiff's auto dealership after a chunk of wood

partially blocked the local drainage system. *Id.* at 121. The Michigan Court of Appeals explained:

> [T]he parties' insurance contract clearly and unambiguously excluded coverage for damage caused directly or indirectly by, among other things, flooding, surface water, water backing up from a sewer or drain, contributing weather conditions, or faulty or inadequate maintenance of property on or off the insured's premises. The policy expressly excluded coverage for such losses 'regardless of any other cause or event that contributes concurrently or in any sequence to the loss.' It appears to us that plaintiff's losses were the result of an unfortunate sequence or concurrence of direct and indirect causes: heavy rainfall creating surface water that failed to drain away because of debris blocking the drainage system.
>
> Plaintiff's claim that the blocked drainage system was 'the proximate cause' of its losses misses the point: Whether the blocked drainage system was a direct or indirect cause of plaintiff's water damage, or whether it was *the* principal factor or merely *a* contributing factor, the policy expressly excluded coverage.
>
> Accordingly, plaintiff has failed to assert the existence of a genuine issue of material fact, and the trial court did not err in finding that, as a matter of law, plaintiff's losses plainly were excluded from coverage. Summary disposition was proper.

*Id.* (emphasis in original) (citations omitted).

The Institute, however, argues that *Sunshine Motors* "actually supports [its] position." ECF No. 29, PageID.786. Plaintiff emphasizes

that the blockage resulted in *flood* water not being drained away "(meaning *flood* water couldn't enter the drainage system and therefore maintained its character as *surface* water)," and that, in turn, the *surface* water flooded the dealership by entering its thresholds, "making it an excluded loss." *Id.* at PageID.786–87. The Institute declares that the event that 'contributed concurrently' to the loss was the blockage, "but the damage was ultimately caused by *surface* water flooding, which is why anti-concurrent causation language deemed the loss as 'caused by flood' even though a drain blockage took place first in the sequence of events." *Id.* (emphasis added). Whether *Sunshine Motors* can be contorted to fit the Institute's theory is irrelevant—it is not the rationale of the appellate court. Nor is Plaintiff's theory relevant here.

The Endorsement is clear. Sentinel will not pay for water (whether flood or surface) or other materials that back up from any sewer or drain "when it is caused by any flood…regardless of the proximity of the flood[.]" ECF No. 1-2, PageID.118. And flood, as defined by the Endorsement, "includes the accumulation of surface water, waves, tides, tidal waves, overflow of streams or other bodies of water, or their spray, all whether driven by wind or not that enters the sewer or drain system." *Id.*; *see Vushaj v. Farm Bureau Gen. Ins. Co. of Michigan*, 773 N.W.2d 758 (Mich. Ct. App. 2009) ("Contractual terms must be construed in context and read in light of the contract as a whole."); *Hawkeye-Security Ins. Co.*, 460 N.W.2d 329., ("A reasonable and practical construction of the exclusions

reveals that they [must] apply[.]"). The Institute's reading of the Exclusion and the Endorsement is not supported by the plain terms of those instruments.

## F. Issues of Material Fact

Finally, the Institute maintains a fallback: "At the very least, viewing the evidence in the light most favorable to Plaintiff, there is a genuine dispute of material fact regarding the cause of damage to Plaintiff's Property." ECF No. 29, PageID.783. There is not.

The Institute asserts that its case "is distinguishable…because Plaintiff [has] submitted evidence that the Property's damage was caused *solely* by water backup, and not a combination of surface water flooding and drain backup." ECF No. 29, PageID.790 (emphasis in original). But Plaintiff misunderstands what is required of it to establish a genuine issue of material fact. The burden of proof lies with the Institute to establish its entitlement to coverage. To do so, Plaintiff must present evidence showing that the flooding on June 25–26 played no role— whatsoever—in the water backup that occurred at its commercial property.

The Institute's brief argued that there remains a genuine issue of material fact based on three statements attributed to the Institute's expert.  Specifically, the brief says their expert:

(i)     "[C]oncluded that the damage occurred because water entered the building through its subbasement and basement floor drains. Fact Appendix 3 at p. 3."

(ii)    "[R]efuted the claim by Sentinel's expert that surface water contributed to the building's damage by specifically identifying the miscalculations and misrepresentations made by Sentinel's expert." The Institute's expert "stated there was no evidence supporting otherwise. Fact Appendix 4 at 11. ECF No. 22-15."

(iii)   "[C]onfirmed that water backup was the sole cause of the building's damage, and that surface water did not in any way contribute to the building's damage." [No Citation.]

*See* ECF No. 29, PageID.791.

But these statements are conclusory or misrepresentations of the expert's reports. A thorough review of the March 1, 2023 Report ("Report") and March 29, 2023 Rebuttal report ("Rebuttal") tendered by the Institute's expert, Bruce H. Clarke, P.E. ("Clarke") confirms that Plaintiff has not presented a genuine issue of material fact. ECF No. 22-14; ECF No. 22-15.

*First*, the Court has explained why the Institute's "conclusion" that water entered through subbasement and basement drains does not, alone, establish anything of consequence. *Supra* § IV(e).

31

Moreover, the most critical part of Clarke's March 1 Report is the sentence directly above the one the Institute offers, labeled above as Point (i). [7]    Clarke closes the Report with a summary list of his conclusions. The conclusion that matters most stemming from Clarke's Report is front and center—it is Number One: "The cause of the sewer backup that resulted in the water intrusion is *undetermined.*" ECF No. 29-4, PageID.822 (emphasis added).

*Second*, the Institute continues to misunderstand its burden. Calling attention to the portions of Sentinel's report that may be inconsistent or for which Clarke offers an 'alternative,' or even a 'more likely' theory, is not the Institute's burden. Plaintiff does not demonstrate a genuine issue of material fact solely by disproving each of the Defendant's offered theories; the Institute is obligated to present an affirmative case on its own behalf. In other words, a genuine issue is not created by proving each of Sentinel's offered theories wrong. Rather, a genuine issue is presented by the Institute only if it offers proof that the rainfall event played no part in the water intrusion. Clarke's report does not say that.

---

[7] "The source of the water was floor drains in the building subbasement and eventually, floor drains at the basement level." ECF No. 29-4, PageID.822.

*Third*, even were the Court to accept the Institute's contention[8] that Clarke "confirmed that water backup was the sole cause of the building's damage, and that surface water did not in any way contribute to the building's damage," this statement would still not be sufficient to carry Plaintiff's burden because Clarke's distinction between "surface water" and "water backup" is not meaningful when the flood has been shown to be a contributing cause to the "water backup."

In his Rebuttal, Clarke—attempting to demonstrate the flaws in Sentinel's supposed 'surface water overflow' position[9] quotes a portion of a Great Lakes Water Authority ("GLWA") report authored by Applied Science, Inc. that Sentinel's expert did not: "Discuss[ing] the operating conditions for the Baby Creek CSO facility," Clarke notes, "it states that '...reduced outfall capacity due to sludge deposition [is] an issue that increased upstream wastewater levels during peak flow conditions and exacerbated flooding.'" ECF No. 22-15, PageID.714. Clarke continues quoting, "'Either the Baby Creek Enclosure has more head loss than

---

[8] The Institute provides no citation in support of this proposition. *See* ECF No. 29, PageID.791.

[9] Clarke's Report and Rebuttal, and his methodology, turn largely on determining whether evidence "supported [Defendant's] presumption" that the Institute's "damage was the direct result of the area-wide heavy rains and the corresponding demands placed on the area sewers," or "if another cause, such as a sewer blockage was as, or more likely, the cause[.]" ECF No. 22-15, PageID.710 (emphasis added). Presenting other "likely" causes is not presenting proof that the flood was not a contributing cause.

expected due to blockages or sediment depths, or the peak flow rates through the screening/disinfection facility are being significantly underestimated.'… I consider that a combination of those issues is *also* a distinct possibility." ECF No. 22-15, PageID.714 (emphasis added).

Clarke could not determine the cause of the backup in his March 1, 2023 Report, yet he adds that, in his opinion, "one or more sewer blockages is the *most likely* cause of water backing up into the subject property." ECF No. 22-15, PageID.710 (emphasis added). The March 31, 2023 Rebuttal concludes similarly: "[M]y opinion remains that the cause of the water backup…is undetermined. I continue to maintain that a sewer blockage is *as or more likely* to have caused this particular water backup than surface flooding from heavy rains…overwhelming the area sewer systems." No. 22-14, PageID.705.

The Institute must demonstrate "sufficient probative evidence" that permits a finding in its favor "on more than…speculation, conjecture, or fantasy." *Arendale v. City of Memphis*, 519 F.3d 587, 601 (6th Cir. 2008). The 'mere possibility' of a factual dispute cannot create a triable case. *Combs*, 354 F.3d at 576.

The Endorsement's 'Sewer and Drain Backup' provision, ECF No. 1-2, PageID.118, provides additional coverage for direct physical loss or physical damage to the Covered Property at the 'scheduled premises' when such damage is caused *solely* by water that backs up from a sewer or drain; yet, there is a crucial caveat: the "water or other materials that

34

back up from any sewer or drain" is not covered "when it is caused by any flood." ECF No. 1-2, PageID.118. The provision reinforces this caveat as succinctly as possible: "THIS IS NOT FLOOD INSURANCE." ECF No. 1-2, PageID.118. Both the Stretch for Schools Endorsement and the Policy's anti-concurrent and anti-sequential provisions exclude coverage for any damages from a drain and sewer backup caused by a flood. Plaintiff has failed to raise a genuine issue of material fact that such water did not enter the Covered Property. *See Villamil v. Sentinel Ins. Co., Ltd.*, 356 F. Supp. 3d 418, 428 (D.N.J. 2018). Therefore, Defendant's motion for summary judgment must be **GRANTED.**

## V.    CONCLUSION

The insurance policy expressly excluded coverage for damage caused by flood. Thus, Sentinel did not breach its contract by denying the Institute's claim. Accordingly, Sentinel's Motion for Summary Judgment is **GRANTED**. Judgment will therefore be entered in favor of Sentinel.

This Opinion also satisfies Sentinel's counterclaim for a declaratory judgment establishing its rights and obligations under the Policy, and this case is **DISMISSED WITH PREJUDICE**.

**IT IS SO ORDERED.**


Dated: March 31, 2024            s/Terrence G. Berg
                                 TERRENCE G. BERG
                                 UNITED STATES DISTRICT JUDGE